# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | No. 16 C 8092 |
| v. | ) ) | Magistrate Judge Finnegan |
| PACTRANS AIR & SEA, INC., KETTY Y. PON, ALEXANDER PON, and CHANCE PON, | ) ) ) ) ) | |
| Defendants. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Union Pacific Railroad Company ("Union Pacific"), a Delaware corporation with its principal place of business in Omaha, Nebraska, is an interstate railroad that transports freight, including intermodal cargo. Defendant Pactrans Air & Sea, Inc. ("Pactrans") is an Illinois freight logistics company with its principal place of business in Bensenville, Illinois. Beginning in 2010, the parties did business together in relation to the importation of shipping containers from China. This lawsuit was filed because Pactrans admittedly owes Union Pacific $5,834,633.21 yet has not repaid the funds and apparently lacks the financial ability to do so.

Pactrans came to possess these funds because Union Pacific regularly transferred money to Pactrans to pay customs charges and other fees associated with the container importation process. When Union Pacific sought the return of approximately $5.8 million (after receiving a favorable ruling from the International Trade Commission that certain fees were *not* owed and would be refunded), it discovered that Pactrans had never paid

these fees. Despite promptly demanding a refund from Pactrans, Union Pacific has not received any of the monies owed.

In this diversity lawsuit, Union Pacific charges Pactrans, its President Kitty Pon (whose name was apparently misspelled in the complaint as "Ketty"), its secretary Alexander Pon (Kitty's husband), and employee Chance Pon (the son of Kitty and Alexander) with breach of fiduciary duty, conversion, and breach of contract. Union Pacific has also stated actions for money had and received and for an accounting, and seeks to pierce the corporate veil to access the Pons' personal assets in recovering the $5.8 million. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

After Union Pacific responded to Defendants' motion to dismiss under Federal Rule 12(b)(6), the parties engaged a private mediator in an attempt to settle the case. When those negotiations failed, Union Pacific filed the instant motion for summary judgment even though the parties have not conducted any discovery in this case. Defendants withdrew their motion to dismiss on August 11, 2017, leaving the Court to resolve only the fully briefed motion for summary judgment. The Court has carefully reviewed the record, including arguments made during a hearing on November 3, 2017, and now grants Plaintiff's motion in part and denies it in part.

## OVERVIEW

Before turning to the facts, it is helpful to understand that the underpinning for Union Pacific's early summary judgment motion is a Customs Power of Attorney ("Customs POA") that it executed in favor of Pactrans on March 5, 2015. (Doc. 39, at 1) ("The only transaction that is at issue before this Court involves the Customs [POA] that

was executed by Union Pacific on March 5, 2015.").  As Union Pacific sees it, this was the operative contract through which it agreed that Pactrans would serve as its agent, attorney, and customs broker, and entrusted Pactrans with $5.8 million to pay customs charges and perform other duties.  In Union Pacific's view, by failing to pay the customs charges and not returning those funds, Pactrans breached that contract.  Because this contract was a Power of Attorney, Union Pacific argues that Pactrans also breached fiduciary duties as a matter of law.

Pactrans disagrees.  While acknowledging that Union Pacific may have a restitution claim for overpayment, it asserts that the focus on the March 5th Customs POA is an attempt by Union Pacific to invent a tort claim in order to hold the individual defendants liable and contest dischargeability in the event of bankruptcy.  This argument is premised on Kitty Pon's representation that Pactrans, which provides "import, export, warehousing, local trucking, and trade show organizing services," is *not* a licensed customs broker and so was unable to provide the customs services described in the POA. (Doc. 37, Kitty Pon Aff., ¶¶ 7, 8).  As a result, Pactrans says the only authority it exercised under the March 5th Customs POA was to execute (on Union Pacific's behalf) a similar Customs POA between Union Pacific and a *licensed* customs broker able to provide these services, which the broker did at Pactrans' direction.

Pactrans also alleges that Union Pacific knew the limited nature of its activities under the POA because the parties had followed the same course of conduct multiple times over the preceding five years.  (Doc. 35, at 7).  Moreover, Union Pacific transferred funds to pay the customs invoices without any requirement that they be segregated from other monies in Pactrans' general operating account or held in trust.  Pactrans claims that

3

since it was not acting pursuant to the Customs POA when it invoiced, collected and handled the money that Union Pacific owed for customs duties and other fees, it had no fiduciary responsibilities to Union Pacific relating to those funds and did not breach its obligations under the POA. Rather, Union Pacific "simply engaged in an arms-length transaction with a routine service provider." (Doc. 35, at 8).

## BACKGROUND[1]

When considering Union Pacific's summary judgment motion, the facts are viewed in a light most favorable to Pactrans. *Continental Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Though the Court must assume the truth of those facts for purposes of this motion, it does not vouch for them. *Arroyo v. Volvo Group N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

### A.    Pactrans Enters into Business with Union Pacific

The relationship between Union Pacific and Pactrans dates back to 2010 when the parties executed a Contract for Work or Services relating to the "Stow, Load and Count of 53' Empty Dry Containers." Under the terms of that contract, Pactrans acted as an independent contractor of Union Pacific. (Doc. 37, Kitty Pon Aff., ¶ 12). Since 2010, Pactrans has provided services to Union Pacific, "primarily relating to Union Pacific['s] importation of shipping containers from China, including arranging for Union Pacific employment of customs brokers to clear goods through customs." (*Id.* ¶¶ 12, 13; Doc. 37, at 5-18).

---

[1]    The following facts are drawn from Plaintiff's Statement of Material Facts Not in Dispute (Doc. 32, at 3-5), Defendants' Response and Statement of Additional Material Facts Not in Dispute (Doc. 36), and exhibits submitted by the parties in support of their factual statements. Unless otherwise specified, page numbers for all record citations are drawn from the CM/ECF docket entries at the top of the filed document.

As noted, the usual course of dealing was for Union Pacific to execute and deliver a Customs POA to Pactrans, which Pactrans would then use to execute and deliver identical Customs POAs to licensed customs brokers "who acted on behalf of Union Pacific with respect to the importation of containers." (Doc. 36, at 6-7 ¶ 3). For example, Union Pacific signed a Customs POA to Pactrans on June 18, 2010, and on June 23, 2010, Pactrans executed two customs power of attorney forms appointing James J. Boyle & Company as customs brokers for Union Pacific. (Doc. 37, at 19-22). Again on April 29, 2013, Union Pacific provided a Customs POA to Pactrans, and Pactrans in turn entered into a Customs POA with Jay J. Kim CHB on Union Pacific's behalf. (*Id.* at 23-24). The next available document shows that on March 2, 2015, Pactrans entered into a Customs POA with Nissin International Transport, U.S.A. Inc. ("Nissin") on Union Pacific's behalf. (Doc. 37, at 25). There does not appear to be an intervening POA from Union Pacific, but three days later, Union Pacific signed the March 5th Customs POA that is at the center of this dispute and described in detail below. (*Id.* at 26). Shortly after this, Pactrans executed two Customs POAs with Harry F. Long, Inc. on behalf of Union Pacific (June 16, 2015 and July 6, 2015). (*Id.* at 27-28). Finally, on July 31, 2015, Union Pacific executed a new Customs POA in favor of Pactrans. (*Id.* at 29).

## B.    The March 5, 2015 Customs Power of Attorney

The March 5, 2015 Customs POA was signed by Union Pacific's Assistant Vice President – Supply, John A. Newman. It named Pactrans as its "true and lawful agent" authorized to "make, endorse, sign, declare, or swear to any entry, withdrawal, declaration, certificate, bill of lading, carnet or other document required by law or regulation in connection with the importation, transportation, or exportation of any

merchandise shipped or consigned by or to [Union Pacific]." (Doc. 36, at 2 ¶ 2; Doc. 32-3). The POA further granted Pactrans the power to

> sign and swear to any document and to perform any act that may be necessary or required by law or regulation in connection with the entering, clearing, lading, unlading, or operation of any vessel or other means of conveyance owned or operated by [Union Pacific]; . . . receive, endorse and collect checks issued for Customs duty refunds in [Union Pacific's] name . . . [a]nd generally to transact at the customhouses in any district any and all customs business, including ISF [importer security filing] and all billing of duty . . . giving to said agent and attorney full power and authority to do anything whatever requisite and necessary to be done in the premises as fully as [Union Pacific] could do if present and acting.

(Doc. 32-3).

### C.    Pactrans Coordinates with Nissin and Invoices Union Pacific

According to Pactrans, Nissin was appointed as customs broker for Union Pacific with respect to the 2015 shipping transactions at issue here.[2] As shipments arrived, Pactrans coordinated with Nissin regarding the determination of import duties and other fees associated with clearing the containers through customs. Pactrans and Nissin cleared all the containers through customs and the containers were delivered to Union Pacific. (Doc. 37, Kitty Pon Aff., ¶ 28).

### D.    The Customs Charges

Pactrans invoiced Union Pacific for customs duties and other fees associated with the shipments, including the Countervailing and Anti-dumping duties (the "Customs Charges") at issue here. (*Id.* ¶ 24). After receiving invoices from Pactrans, Union Pacific transferred funds to Pactrans' general operating account in payment of these invoices.

---

[2]    Though Union Pacific executed the March 5, 2015 Customs POA with Pactrans three days *after* Pactrans entered into the Customs POA with Nissin on behalf of Union Pacific, the parties confirmed during the November 3, 2017 oral argument that any discrepancy in the timing of the signatures can be ignored for purposes of this motion.

(*Id.* ¶ 25). Union Pacific did not require Pactrans to segregate or otherwise hold any of the remittance relating to customs duties and other fees in trust. (*Id.* ¶ 26). Pactrans received more than $15 million from Union Pacific and transferred a substantial portion of these funds to Nissin as expected. Funds not paid to Nissin were paid to ordinary course creditors or Pactrans lenders that had a security interest in funds in the operating account. (*Id.* ¶¶ 27-3). No distributions were made from the Union Pacific funds to the individual defendants other than "ordinary course salary and employee expense reimbursements." (*Id.* ¶ 31).

### E. International Trade Commission Ruling and Request for Refund

In May 2015, the International Trade Commission ("ITC") determined that Union Pacific was not in fact required to pay certain Customs Charges that had been assessed by the U.S. Customs and Border Protection ("CBP"). Union Pacific remained obligated to pay those charges until the ITC's decision was published in June 2015, at which point the CBP began issuing Union Pacific refunds. (Doc. 36, at 4-5 ¶¶ 7, 8, 9). Union Pacific performed an accounting and reconciliation and discovered that Pactrans had "failed to pay all of Union Pacific's customs charges to Nissin International relating to certain of the shipments of containers," which Pactrans admits. This resulted in Union Pacific incurring a $4,359 fine from the CBP. (*Id.* at 5 ¶¶ 10, 11).

Union Pacific's Senior Manager for Strategic Sourcing, Marcia Tauriella, emailed Pactrans on January 5 and 13, 2016, demanding that the company issue a refund for the unpaid Customs Charges. (*Id.* at 5-6 ¶¶ 12, 13). Tauriella expressed concern regarding Pactrans' initial lack of response, and provided the following summary chart describing the $5.8 million owed:

| Refund Type | Vessel | Amount Owed | Comments |
|---|---|---|---|
| ADD[3] | Macaw Arrow | $2,539,152.60 | Never paid to CBP |
| ADD | CSCL Winter 2nd | $1,896,923.83 | Never paid to CBP |
| ADD | CSCL Summer 2nd | $1,176,618.60 | Never paid to CBP |
| CVD | CSCL Summer 1st | $120,643.89 | Pactrans emailed check stub but Union Pacific never received check |
| CVD | CSCL Autumn | $91,894.29 | CVD refunds due from Pactrans |
| Billing Error | CSCL Summer 2nd | $9,400 | Union Pacific gave Pactrans $1,195,418.60 but only $1,186,018.60 was due |

(Doc. 32-5, at 2-4).

To date, Pactrans has not repaid Union Pacific any of the $5.8 million. (Doc. 36, at 6 ¶ 15).

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper when the "'materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials' show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting FED. R. CIV. P. 56(a)). The party opposing summary judgment "cannot merely rest on its pleadings; it must affirmatively demonstrate, by producing evidence that is more than 'merely colorable' that there is a genuine issue for trial." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d

---

[3] "ADD" refers to Anti-dumping duties. "CVD" refers to Countervailing duties. "CSCL" appears to refer to China Shipping Container Lines Co., a container shipping company.

697, 705 (7th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

At the summary judgment stage, a court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. *See also Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (at summary judgment, courts do not "weigh evidence or determine credibility of . . . testimony."). In making this determination, courts "draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party[.]" *Continental Cas. Co.*, 427 F.3d at 1041 (quoting *Franklin v. City of Evanston*, 384 F.3d 838, 843 (7th Cir. 2004)).

## B.    Analysis

Union Pacific seeks summary judgment on all of the legal and equitable claims raised in the complaint. The Court addresses each in turn.

### 1.    Breach of Fiduciary Duty

Union Pacific first argues that Pactrans breached its fiduciary duty to Union Pacific by failing to pay the $5.8 million in Customs Charges, resulting in a $4,359 fine, and by refusing to return the money. To succeed on this claim, Union Pacific must show (1) a fiduciary duty existed; (2) Pactrans breached that fiduciary duty; and (3) the breach proximately caused Union Pacific injury. *Apex Med. Research, AMR, Inc. v. Arif*, 145 F. Supp. 3d 814, 837 (N.D. Ill. 2015).

### a.  Existence of a Fiduciary Duty

A fiduciary relationship exists where a person or entity is under a duty to act for the benefit of another.  *In re Estate of Baumgarten*, 2012 IL App (1st) 112155, ¶ 16.  In Illinois, a fiduciary relationship "may exist as a matter of law between partners, joint adventurers, trustee and beneficiary, guardian and ward, attorney and client, and principal and agent." *In re Estate of Stahling*, 2013 IL App (4th) 120271, ¶ 18 (internal quotations omitted).  A fiduciary relationship may also arise as a matter of fact if "one party reposes special trust and confidence in another[,] who accepts that trust and confidence and thereby gains superiority and influence over the subservient party."  *Tummelson v. White*, 2015 IL App (4th) 150151, ¶ 21.

Union Pacific argues that Pactrans owed it a fiduciary duty as a matter of law pursuant to the March 5, 2015 Customs POA.  (Doc. 32-3; Doc. 37, at 5-18).  As Union Pacific notes, Illinois courts have routinely found that "[a] power of attorney gives rise to a general fiduciary relationship between the grantor of the power and the grantee as a matter of law."  *In re Estate of Elias*, 408 Ill. App. 3d 301, 319, 946 N.E.2d 1015, 1032 (1st Dist. 2011).  *See also In re Estate of Stahling*, 2013 IL App (4th) 120271, ¶ 18 (collecting cases).  Pactrans accepts this general proposition but insists that where, as here, the POA relates to the provision of customs brokerage services, a fiduciary obligation arises only when the agent is acting as a licensed customs broker.

Under federal customs laws, a "customhouse broker is required to obtain a valid power of attorney" before transacting customs business in the name of the principal.  19 C.F.R. § 141.46.  The power of attorney, in turn, creates a fiduciary relationship between the customs broker and the principal.  *See Pinnacle Interior Elements, Ltd. v. Panalpina,*

*Inc.*, No. 3:09-CV-0430-G, 2010 WL 445927, at *5 (N.D. Tex. Feb. 9, 2010) ("[T]he relevant customs statute imposes a fiduciary duty via power-of-attorney agreements" between a customs broker and its principal). Union Pacific has submitted an affidavit from its Senior Manager for Strategic Sourcing, Marcia Tauriella, claiming that Pactrans was engaged to perform "customs brokerage services," and so owed Union Pacific a fiduciary duty. (Doc. 32-2, Tauriella Aff., ¶ 4).

Pactrans has responded with its own affidavits attesting to the fact that it is not a licensed customs broker. (Doc. 37, Kitty Pon Aff., ¶ 8; Doc. 38, Peterson Aff., ¶ 4). Without such a license, Pactrans has no authority to conduct customs brokerage services. *See* 19 U.S.C. § 1641(b)(1) ("No person may conduct customs business . . . unless that person holds a valid customs broker's license issued by the Secretary."). It is for this reason that Pactrans executed a separate Customs POA with Nissin to act as Union Pacific's customs broker. (Doc. 37, at 25; Doc. 38, at 3-5). Notably, Union Pacific has not produced any evidence that Pactrans is itself a licensed customs broker. (Doc. 36, at 6 ¶ 1). On the facts presented, the Court finds that the Customs POA did not give rise to a broker-principal relationship between the parties sufficient to trigger a fiduciary duty on Pactrans' part pursuant to the customs laws.

That does not end the inquiry, however, because the Customs POA still created an agent-principal relationship between Pactrans and Union Pacific. This allowed Pactrans, as Union Pacific's "Attorney-in-fact," to select Nissin as Union Pacific's customs broker. (Doc. 37, at 25). The question is whether Pactrans was acting as Union Pacific's agent when it performed other services relating to the importation of shipping containers, including "coordinat[ing] with Nissin regarding the determination of import duties and other

fees associated with clearing the containers through customs" and "invoic[ing] Union Pacific for customs duties and other fees associated with the shipments." (Doc. 37, Kitty Pon Aff., ¶ 24).

At the oral argument, Pactrans' counsel claimed that Pactrans performed the customs-related activities not pursuant to the Customs POA but as part of its contractual obligations under the parties' Contract for Work or Services. For Pactrans, the appeal of this theory is clear: in the business context, "a contractual relationship normally does not create a fiduciary relationship between the contracting parties." *Glovaroma, Inc. v. Maljack Prods., Inc.*, No. 96 C 3985, 1998 WL 102742, at *4 (N.D. Ill. Feb. 26, 1998) (citing *Oil Express Nat'l, Inc. v. Latos*, 966 F. Supp. 650, 650-51 (N.D. Ill. 1997)). *See also Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin*, 74 Ill. App. 3d 233, 238, 392 N.E.2d 759, 763 (2d Dist. 1979) ("Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.").

The problem for Pactrans is that the stated term of the Contract is 24 months from the September 21, 2010 Effective Date, and there is no evidence that it was ever extended. (Doc. 37, at 5, 6). Even assuming it remained in effect during the transactions at issue in this lawsuit, Pactrans has not presented any evidence demonstrating what it was obligated to do under the Contract. The document defines "Work" as "Stow, Load and Count 53' Empty Dry Containers," and states that "[t]he Work to be performed by [Pactrans] is more particularly set forth in Schedule of Values/Schedule of Billable Service Items, attached hereto." (Doc. 37, at 5). Pactrans did not provide the Court with the

referenced Schedule, a description of the tasks it was to perform, or any evidence that those tasks included paying customs fees.

More importantly, the March 5th Customs POA states on its face that Pactrans is Union Pacific's "true and lawful agent" with respect to any customs transactions, and has "full power and authority to do anything whatever requisite and necessary to be done in the premises as fully as [Union Pacific] could do if present and acting." (Doc. 32-3). The mere fact that Pactrans subcontracted the licensed brokerage services out to Nissin in no way relieved it of its own obligation as Union Pacific's agent to ensure that Nissin paid all necessary Customs Charges on Union Pacific's behalf. This is reflected in the parties' course of dealing, whereby Pactrans (and not Nissin) sent invoices to Union Pacific for customs fees, and Union Pacific transferred funds directly to Pactrans (and not Nissin) to pay those fees. Even viewing the facts in a light most favorable to Pactrans as required in resolving this motion, Pactrans owed Union Pacific a fiduciary duty under the Customs POA relating to the payment of the Customs Charges.

### b.    Breach and Damages

Union Pacific has also demonstrated that Pactrans breached its fiduciary duty under the Customs POA, which proximately caused Union Pacific's damages. *Apex Med. Research, AMR, Inc.*, 145 F. Supp. 3d at 837. The breach occurred when Pactrans admittedly failed to forward the $5.8 million in Customs Charges to Nissin for payment to the CBP. As a direct result of that breach, Union Pacific incurred a $4,359 fine and suffered $5.8 million in damages. Pactrans largely ignores the breach and damages factors, stating only that: "[s]ince Union Pacific has failed to establish any fiduciary relationship, it cannot have damages proximately caused by a breach of any duty arising

from that relationship." (Doc. 35, at 9). In light of the Court's finding that Pactrans owed Union Pacific a fiduciary duty as a matter of law, this argument must fail.

For all the reasons stated here, Union Pacific's motion for summary judgment is granted as to its claim for breach of fiduciary duty.

### 2. Conversion

Union Pacific next seeks summary judgment on its claim for conversion of its $5.8 million. To prove such a claim, Union Pacific must show "(1) a right in the property, (2) a right to the immediate possession of the property, which is absolute, unconditional, and not dependent upon the performance of some act, (3) a deprivation of the right by the unauthorized and wrongful assumption of control, dominion, or ownership by [Pactrans], and (4) a demand for possession of the property." *Fortech, L.L.C. v. R.W. Dunteman Co.*, 366 Ill. App. 3d 804, 809, 852 N.E.2d 451, 456 (1st Dist. 2006) (quoting *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 247, 561 N.E.2d 1245, 1253 (1st Dist. 1990)).

Normally, "[a]n asserted right to money . . . will not support a claim for conversion." *Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002). The exception is when the money at issue can be described as "specific chattel," meaning "a specific fund or specific money in coin or bills." *Id. See also Roderick Dev. Inv. Co. v. Community Bank of Edgewater*, 282 Ill. App. 3d 1052, 1058, 668 N.E.2d 1129, 1134 (1st Dist. 1996) (requiring a "specified identifiable fund."). To prove an absolute and unconditional right to the money, a plaintiff must show that "the money claimed, or its equivalent, *at all times* belonged to the plaintiff" and the defendant converted it to his own use. *Swervo Entertainment Group, LLC v. Mensch*, No. 16 C 4692, 2017 WL 1355880, at *3 (N.D. Ill.

Apr. 13, 2017) (emphasis in original) (quoting *Horbach*, 288 F.3d at 978); *In re Thebus*, 108 Ill. 2d 255, 261, 483 N.E.2d 1258, 1261 (1985).

Here, there is no dispute that Union Pacific has an unconditional right to the $5.8 million in Customs Charges, or that Pactrans failed to pay Union Pacific that money despite repeated demands. The only disagreement is whether this money constitutes a specific chattel. The mere fact that Pactrans placed the money in its general operating account is not dispositive. Under Illinois law, money "need not be held in a segregated account" for it to be subject to a conversion claim, so long as it is "sufficiently identifiable" such as "where a specific amount is transferred to [the recipient] from an outside source." *Gates v. Towery*, 435 F. Supp. 2d 794, 801 (N.D. Ill. 2006) (citing *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 346 Ill. App. 3d 996, 1003-05, 806 N.E.2d 280, 285-86 (2d Dist. 2004)).

Illinois courts have taken "a variety of approaches" in determining whether funds are sufficiently identifiable. *American Inter-Fidelity Corp. v. M.L. Sullivan Ins. Agency, Inc.*, No. 15 C 4545, 2017 WL 2506393, at *3 (N.D. Ill. June 9, 2017). In *Chicago Dist. Council of Carpenters Welfare Fund v. Gleason & Fritzshall*, 295 Ill. App. 3d 719, 693 N.E.2d 412 (1st Dist. 1998), for example, the court held that allegedly converted funds were sufficiently specific when described by a particular check. *Id.* at 726, 693 N.E.2d at 417. In *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 565 N.E.2d 93 (1st Dist. 1990), on the other hand, the court held that there was no conversion when the defendant refused to return an overpayment because the check was not a specific chattel. *Id.* at 886, 565 N.E.2d at 97, 100.

Initially, Union Pacific's only evidence regarding the $5.8 million was a summary chart found in an email that Marcia Tauriella sent to Pactrans in January 2016. *See infra* pp. 7-8. At the November 3, 2017 hearing, the Court gave Union Pacific an opportunity to submit additional documentation, such as the invoices that Pactrans sent to Union Pacific, the exact amounts Union Pacific sent to Pactrans, the methods and dates of payments made to Pactrans, and a description of the nature and purpose of each payment. (Doc. 47). On November 17, 2017, Union Pacific timely produced the following: (1) a summary prepared by Ms. Tauriella showing Union Pacific's transactions with Pactrans relating to the Customs Charges; (2) invoices and documentation authorizing payments to Pactrans; (3) a summary prepared by Ms. Tauriella showing the wire transfers Union Pacific made to Pactrans; (4) an itemization prepared by Pactrans showing all payments Union Pacific made to Pactrans for Customs Charges; and (5) a reconciliation log prepared by Ms. Tauriella showing the refund payments received by Union Pacific. (Doc. 48-1 through 48-13). Pactrans generally denies that these records support Union Pacific's claims in this case, but does not challenge their accuracy or point to any contrary invoices or calculations. (Doc. 49, at 1-2).

On closer review, Union Pacific's uncontested documentation shows the commercial invoices it received from Pactrans relating to 5 shipping transactions where Union Pacific either did not receive a refund at all from the CBP for Customs Charges, or received only a partial refund. The invoices show the amounts Pactrans asked Union Pacific to pay for Anti-dumping duties and Countervailing duties for each transaction. (Doc. 48-3, at 3-26; Doc. 48-4, at 3-15; Doc. 48-5, at 3-4; Doc. 48-6, at 3-8; Doc. 48-7, at 3-6; Doc. 48-8, at 3-5; Doc. 48-9, at 3-44; Doc. 48-10, at 3-49). Additional records show

that Union Pacific sought and obtained internal authorization to pay those invoices. (Doc. 48-3, at 1; Doc. 48-4, at 1; Doc. 48-5, at 1; Doc. 48-6, at 1; Doc. 48-7, at 1; Doc. 48-8, at 1; Doc. 48-9, at 1; Doc. 48-10, at 1).

Ms. Tauriella's summary document showing each wire transfer Union Pacific sent to Pactrans, including the date and invoice reference, reflects that the amounts transferred correspond with the amounts requested in the Pactrans invoices. (Doc. 48-13). The document Pactrans generated for Union Pacific showing the payments it received from Union Pacific relating to the shipping container transactions indicates that the amounts received correspond with the amounts wired by Union Pacific as requested in the Pactrans invoices. (Doc. 48-11). Finally, Ms. Tauriella prepared a summary of each refund payment Union Pacific received from the CBP, including check number, date of check, and date of receipt. (Doc. 48-12).

Based on this evidence, the Court finds that the $5.8 million is "sufficiently identifiable" to constitute a specific chattel in that Union Pacific transferred specific amounts to Pactrans in payment of itemized invoices for Customs Charges owed to the CBP. *Gates v. Towery*, 435 F. Supp. 2d at 801. Contrary to Pactrans' assertion, this money cannot be characterized as simply a debt against Pactrans. (Doc. 35, at 10) (citing *In re Thebus*, 108 Ill.2d at 261, 483 N.E.2d at 1261 ("[T]he general rule is that conversion will not lie for money represented by a general debt or obligation.")). First and foremost, Union Pacific did not owe any Customs Charges to Pactrans and so was never "in debt" to Pactrans for those amounts. *See Addante v. Pompilio*, 303 Ill. App. 172, 174, 176, 25 N.E.2d 123, 124-25 (1st Dist. 1940) (defendant was liable for conversion where the plaintiff gave him money to transmit to the plaintiff's brother but the defendant never

forwarded the money and instead used it for his own purposes). *Cf. Zang v. Alliance Fin. Servs. of Ill., Ltd.*, 875 F. Supp. 2d 865, 882 (N.D. Ill. 2012) (finding no conversion claim where "the payor made up-front payments for products or services that were ultimately not provided by the payee.").

In addition, the fact that Union Pacific voluntarily transferred the money to Pactrans is not dispositive. It is true that "[a] debtor-creditor relationship is created when a party, the creditor, transfers his property voluntarily to another, the debtor." *European American Bank v. Prime Leasing, Inc.*, No. 00 C 5777, 2001 WL 563783, at *2 (N.D. Ill. May 23, 2001) (citing *Illinois Bell Tel. Co. v. Wolf Furniture House, Inc.*, 157 Ill. App. 3d 190, 194, 509 N.E.2d 1289, 1291-92 (1st Dist. 1987)). Since the $5.8 million represented specific payments that were to be forwarded to the CBP, however, it is sufficiently identifiable as property belonging to Union Pacific for purposes of a conversion claim. *See, e.g., Roderick Dev. Inv. Co.*, 282 Ill. App. 3d at 1064, 668 N.E.2d at 1138 (plaintiff's claim for conversion survived a motion to dismiss where it alleged that the defendant failed to transfer money "given to it for a specific purpose.") (discussing with approval *Unified Services, Inc. v. Home Ins. Co.*, 218 Ga. App. 85, 460 S.E.2d 545 (1995) (client could maintain conversion action for premiums a broker billed to the client but failed to transfer to the insurer on the client's behalf)).

In sum, Union Pacific has demonstrated that Pactrans converted its $5.8 million, and summary judgment is granted on this claim.

### 3. Breach of Contract

To succeed on its breach of contract claim, Union Pacific must prove: (1) the existence of a valid and enforceable contract; (2) performance by Union Pacific; (3)

breach of contract by Pactrans; and (4) resultant injury to Union Pacific. *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 323 Ill. App. 3d 15, 27, 752 N.E.2d 33, 43 (1st Dist. 2001). Union Pacific argues that the operative contract is the Customs POA, which it says required that Pactrans act as its fiduciary and "pay Customs Charges that Union Pacific owed to the CBP on behalf of Union Pacific." (Doc. 32, at 9). Yet nothing in the POA sets forth the precise terms of the parties' purported agreement, such as whether Union Pacific was required to pay Pactrans for its services and, assuming so, the amount. When asked during the November 3, 2017 hearing to identify the specific contract terms that Pactrans allegedly breached, Union Pacific described the parties' "course of dealing," which involved Pactrans sending invoices to Union Pacific for customs duties and other fees associated with importing the shipping containers, and Union Pacific paying those invoices. Of course, none of this is reflected in the Customs POA that Union Pacific is claiming as the basis for the contract claim.

Also missing is any effort by Union Pacific to establish that in executing the Customs POA, there was "an offer, a strictly conforming acceptance to the offer, and supporting consideration" as required to create a contract. *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 835 (N.D. Ill. 2009) (quoting *Brody v. Finch Univ. of Health Sciences/The Chicago Med. Sch.*, 298 Ill. App. 3d 146, 154, 698 N.E.2d 257, 265 (2d Dist. 1998)). Moreover, the one case Union Pacific relies upon to support its summary judgment motion is entirely distinguishable in that it did not involve a POA, and the parties there agreed that they had a legally binding contract. *Ace Hardware Corp. v. Marn, Inc.*, No. 06 C 5335, 2008 WL 4286975, at *5 and n.8 (N.D. Ill. Sept. 16, 2008).

Viewing the facts in a light most favorable to Pactrans, the Court cannot find as a matter of law that Pactrans committed breach of contract relating to the Customs POA. Union Pacific's motion for summary judgment on this claim is denied.

### 4. Action for Money Had and Received

Union Pacific likewise is not entitled to judgment as a matter of law on its action for money had and received. A cause of action for money had and received is an equitable action similar to a claim for unjust enrichment. *Bueker v. Madison County*, 2016 IL App (5th) 150282, ¶ 53. It is "maintainable where defendant has received money that in equity and good conscience belongs to the plaintiff." *Id.* (citing *Drury v. McLean County*, 89 Ill.2d 417, 425-26, 433 N.E.2d 666, 670 (1982)). Illinois courts have made clear that "[a]n equitable remedy is not available where there is an adequate remedy at law." *CC Disposal, Inc. v. Veolia ES Valley View Landfill, Inc.*, 406 Ill. App. 3d 783, 788, 952 N.E.2d 14, 18 (4th Dist. 2010) (quoting *Newton v. Aitken*, 260 Ill. App. 3d 717, 720, 633 N.E.2d 213, 216 (2d Dist. 1994)). As the party seeking equitable relief, Union Pacific "has the burden of proving the inadequacy of a legal remedy." *Id.* at 788, 952 N.E.2d at 19.

Union Pacific has not made any showing at all regarding the adequacy of its legal remedies. This may be because Union Pacific is seeking money damages for both its breach of fiduciary duty and breach of contract claims. Since Union Pacific has prevailed on the breach of fiduciary duty claim and can recover a legal remedy for its $5.8 million in losses, there is no basis for Union Pacific to obtain equitable relief. The action for money had and received is denied.

### 5.     Action for an Accounting

Union Pacific's action for an accounting is also an equitable remedy, but it is treated somewhat differently by Illinois courts.  "To sustain an action for accounting in equity, the complaint must allege the absence of an adequate remedy at law and one of the following: '(1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature.'"  *Mann v. Kemper Fin. Cos., Inc.*, 247 Ill. App. 3d 966, 980, 618 N.E.2d 317, 327 (1st Dist. 1992) (quoting *People ex rel. Hartigan v. Candy Club,* 149 Ill. App. 3d 498, 501, 501 N.E.2d 188, 190 (1st Dist. 1986)).  When an accounting is sought based on a breach of fiduciary duty, however, a plaintiff may proceed with the action even when it has adequate legal remedies.  *Id.  See also Homestead Ins. Co. v. Chicago Transit Auth.*, No. 96 C 4570, 1997 WL 43232, at *2 (N.D. Ill. Jan. 23, 1997).  In all cases, "the Court may find that an accounting is not necessary where the party seeking it 'had full access to all pertinent records and documents' through discovery."  *Chicago Title Ins. Co. v. Sinikovic*, 125 F. Supp. 3d 769, 777 (N.D. Ill. 2015) (quoting *Newton*, 260 Ill. App. 3d at 723, 633 N.E.2d at 218).

Here, the Court has found that Pactrans breached its fiduciary duty under the Customs POA.  In addition, since no discovery has taken place in this action, Union Pacific has not had full access to Pactrans' financial records through the discovery process.  Union Pacific's request for an accounting is therefore granted.  *See Kurtz v. Solomon*, 275 Ill. App. 3d 643, 653, 656 N.E.2d 184, 192 (1st Dist. 1995) (finding that trial judge abused discretion in denying accounting where the plaintiffs proved breach of fiduciary relationship).

**6.      Piercing the Corporate Veil**

Union Pacific finally seeks summary judgment on its purported "claim" to pierce the corporate veil.  (Doc. 32, at 12).  As Pactrans correctly notes, however, "[t]he doctrine of piercing the corporate veil is an equitable remedy; it is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract."  *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 527, 778 N.E.2d 291, 294-95 (2d Dist. 2002).  Absent an independent cause of action for piercing the corporate veil, Union Pacific's motion for judgment as a matter of law on such a claim is improper.

Nor has Union Pacific presented sufficient evidence at this time to justify piercing the corporate veil in any event.  "Illinois courts will pierce the corporate veil where: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances."  *Steiner Elec. Co. v. Maniscalco*, 2016 IL App (1st) 132023, ¶ 46 (internal quotations omitted).  In determining whether the "unity of interest" requirement has been satisfied, courts examine a variety of factors, including:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders.

*Id.* ¶ 47.

Union Pacific's primary rationale for needing to pierce the corporate veil is its contention that the individual Defendants (Kitty, Alexander and Chance Pon) have

commingled their personal assets with those of Pactrans. (Doc. 32, at 13; Doc. 39, at 5). As a preliminary matter, the evidence submitted to the Court indicates that while Kitty and Alexander are officers, directors and shareholders of Pactrans, Chance is merely an employee. (Doc. 37, Kitty Pon Aff. ¶¶ 2-5). Union Pacific cites no authority for the proposition that a corporation's veil may be pierced to access an employee's personal assets. *See Semande v. Estes*, 374 Ill. App. 3d 468, 471, 871 N.E.2d 268, 271 (3d Dist. 2007) ("A corporation is a legal entity separate and distinct from its shareholders, directors, and officers. . . . However, a court may find corporate officers, directors or shareholders personally liable for corporate obligations through [the] remedy [of] piercing the corporate veil.").

With respect to Kitty and Alexander Pon, Union Pacific's evidence that they commingled personal and corporate funds consists entirely of the following statement in Marcia Tauriella's affidavit: "It was communicated to me by Pactrans that the [$5.8 million] in Customs Charges was commingled into members of Pactrans personal funds." (Doc. 32-2, Tauriella Aff., ¶ 16). Tauriella fails to identify who at Pactrans told her about such commingling of personal and corporate assets, the form of that communication, when it occurred, or whether anyone else was a party to the communication. Such a vague and conclusory statement without any supporting facts is wholly inadequate to allow Union Pacific to pierce the corporate veil as a matter of law. *See* Fed. R. Civ. P. 56(c)(4) (affidavits supporting summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Cooper-Schut v. Visteon Automotive Sys.*,

361 F.3d 421, 429 (7th Cir. 2004) ("A court must not consider parts of an affidavit that fail to meet the standards of Rule 56.").

Union Pacific finds it significant that Pactrans admits to depositing Union Pacific's money into its general operating account and commingling it "with all of Pactrans' other receipts." (Doc. 39, at 5; Doc. 36, at 4 ¶ 6). Of course, this cannot be construed as an admission that Pactrans commingled Union Pacific's money with the Pons' *personal* assets. Moreover, Pactrans claims that Union Pacific did not require it to segregate payments received or hold them in trust, and Union Pacific has not offered any contrary evidence. (Doc. 37, Kitty Pon Aff., ¶ 26).

On the record presented, Union Pacific's summary request to pierce the corporate veil is denied.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [31] is granted in part and denied in part.

ENTER:

Dated: December 20, 2017

_Sheila Finnegan_

SHEILA FINNEGAN
United States Magistrate Judge